**Charlotte IMHOFF, Plaintiff,**

v.

**KMART STORES OF INDIANA, INC. and KMart Corporation, Defendants.**

**No. 00 cv 0256 AS.**

United States District Court, N.D. Indiana, South Bend Division.

May 25, 2001.

W. Douglas Thorne, James R. Byron, Jacob S. Frost, Elkhart, IN, for Plaintiff.

Richard A. Smile, Melissa S. Vare, Bradley L. Wilson, Indianapolis, IN, for Defendants.

### *MEMORANDUM AND ORDER*

ALLEN SHARP, District Judge.

This cause is before the Court on the Defendants' Motion for Summary Judgment filed on February 23, 2001. The Plaintiff, Charlotte Imhoff, filed a Complaint with this Court alleging that KMart discriminated against her based on sex and retaliated against her for filing complaints objecting to sex discrimination and harassment, all in violation of her federally protected rights under Title VII of the Civil Rights Act of 1964.

Imhoff claims that this discrimination and harassment ultimately lead to her termination in June, 1999, after twenty-four years of employment with KMart. The Plaintiff also alleges that the Defendants' conduct was so severe and outrageous as to amount to an intentional infliction of emotional distress. Both parties are represented by able counsel who have filed extensive briefs and supporting documentation on the issues. After considering the submissions of the parties and the case law on the issues, the Court now rules as follows.

### *I. JURISDICTION*

Jurisdiction is based upon the presence of a federal question under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e, and is proper pursuant to 42 U.S.C. § 2000e–5(f)(1)-(3) and 28 U.S.C. § 1331.

## II. RELEVANT FACTS

There are very few material facts in this case that are not disputed by the parties. The Court has before it a massive factual record containing numerous disputed issues. Nevertheless, the Defendants assert that there are no genuine issues of material fact relating to Plaintiff's claims in this matter and that KMart is entitled to judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 56.

At the summary judgment stage, the Court must take all unchallenged facts as true, and resolve factual disputes in favor of the nonmoving party, in this case, the Plaintiff. Therefore, for purposes of this motion, the Court assumes that Plaintiff's version of the facts is correct, except where Defendants have provided additional facts which the Plaintiff did not challenge.

Imhoff began her employment with KMart on January 9, 1975, upon graduation from college. Pl.'s Statement of Material Facts at 1 ("Pl.'s Stmt"). She was hired initially as an assistant manager. Id. She was transferred approximately five times to different stores to fill assistant manager's position between 1975 and 1987, usually at KMart's request. Id. However, once during this time period, she requested a transfer, which was granted. Id. KMart paid her expenses for all of these transfers. Def.'s Statement of Material Facts at 1 ("Def.'s Stmt"). In 1988, Imhoff was promoted to the position of Store Manager in Atlantic, Iowa. Id. The Plaintiff's career progressed, and she had a track record of turning stores around that were in trouble and losing money. Pl.'s Stmt at 3. Imhoff consistently received positive evaluations, either meets or exceeds expectations, with commendations for her leadership abilities, her communications skills, her interpersonal skills, and her general management abilities. Id. In 1996, Imhoff took over as manager of Defendants' store in Elkhart, Indiana, where she increased sales performance each year that she was there. Id.

However, in 1998, Imhoff's relationship with her employer began to sour, beginning shortly after she complained to corporate headquarters and to the regional office about what she believed to be sexual harassment by a corporate executive. Pl.'s Br. in Opp. at 2. The executive, John Curry, was at Plaintiff's store to supervise an extensive renovation project. Pl.'s Stmt at 11–12. Curry engaged in conduct while at the store that included touching female employees, including the Plaintiff, pulling female employees up to his chest, discussing "wet dreams" with female employees, and making constant phone calls to female employees, including calls to the Plaintiff late at night. Id. A number of female employees were subjected to similar conduct by Curry, and supported the Plaintiff's decision to report the conduct to corporate headquarters, although one employee warned the Plaintiff, "It's your career." Id.

The Plaintiff filed her first report of sexual harassment with corporate headquarters in August, 1998. Id. Nothing was done in response to this report. Instead, in October, 1998, Curry was back in the Elkhart store engaging in the same conduct, including touching the Plaintiff. Id. The Plaintiff filed her second complaint of sexual harassment, this time to Dave Haluska, District Manager in the regional office, who then reported the incidents to the Regional Director of Human Resources, Gayle Sullivan. Id. This time, the complaint was investigated, and Plaintiff

was told that Curry would no longer be coming to her store. Id.

About the time of the second complaint, the District Manager's position in Plaintiff's district came open. Id. at 13. The Plaintiff was not considered for the position, even though she had been placed on the Defendants' Succession Planning List by her previous District Manager, Dave Haluska, who considered the Plaintiff to be the logical choice for the position.[1] Pl.'s Mem. in Opp. at 12–13, Haluska Dep. at page 62. An outside human resources evaluation firm, Personnel Decisions, Inc., also concluded that the Plaintiff "appears ready for the District Manager Position at KMart." Id. This outside firm noted that the Plaintiff had "primary strengths" in the areas of interpersonal skills and communication.

Instead of being promoted, Plaintiff received her first reprimand from the Regional Office in October, 1998. Pl.'s Stmt at 13. In January, 1999, Tim Rommel was promoted to the open district manager's position. Id. Rommel was a male manager who was not on the Succession Planning List.[2] In February, 1999, after being denied the promotion to district manager, Plaintiff complained to the new district manager that she felt there were gender inequities at KMart in terms of both pay and advancement opportunities. Id. The Plaintiff claims that at the time she was denied the promotion, there was only one

female district manager out of twenty-five in the Great Lakes Region, and that she was subsequently demoted. Id. at 14. The current Regional Vice President, Stephen St. John, testified in his deposition that up to this point, he could not recall that he had ever promoted a woman to the position of district manager in his career. Pl.'s Br. in Opp. at 15; St. John Dep. at page 40.

Immediately after complaining about sex discrimination and unequal treatment, Plaintiff believes she became a target for KMart, beginning with an investigation conducted in a such an unusual manner that it was unprecedented at KMart.[3] Id. To conduct the investigation, Regional Manager Rod Brumley came to the store unannounced and proceeded to call a number of employees into the office and meet with them privately. Id. The reason given for this investigation was the receipt of two anonymous letters complaining about the Plaintiff, one in December, the other in January. Id. at 16. One of these letters had already been investigated by the previous District Manager, Haluska, and found to be meritless. Id. Haluska documented this conclusion in a written report submitted to Gayle Sullivan, Regional Director of Human Resources. The Plaintiff supports her claim that this investigation was unprecedented with deposition testimony from several long-time KMart employees.[4] Pl.'s Stmt at 15.

1. Haluska stated, "Charlotte was my—you know, the one I was doing it [hands-on training] with and who I thought would take my spot when I left." Haluska Dep. at page 61, lines 19–24.

2. KMart contests this fact, as well as Plaintiff's assertion that another male promoted to District Manager, Wayne Brigee, was not on the Succession Planning List either. KMart points out that Plaintiff's evidence was not current, but KMart has not provided the Court with a copy of a Succession Planning List that contains the names of Rommel or

Brigee, therefore, for purposes of this motion, the Court assumes that these two males were promoted without being placed on the List.

3. The timing of the investigation at Plaintiff's store in relation to her complaint is contested, as is the number of complaint letters, but for purposes of this motion, the Court must use the Plaintiff's version of the facts.

4. Dave Haluska, the former District Manager, testified that he had never seen such an investigation in his twenty-six years with the store.

Over the next few months, Plaintiff's store was visited with increased frequency by various members of Defendants' regional management. During these visits, Imhoff was criticized and reprimanded in front of her subordinates, told she was "never going to make it," told, "You're not going anywhere," told that she should consider resigning from KMart, and given highly critical comments over minor issues. Id. at 17–18. One of the visits was from Sullivan, who was more sympathetic and promised that she would follow up on Plaintiff's complaints of sex discrimination. Id. However, in her report, Sullivan[5] stated that when Plaintiff asked if Sullivan agreed with her theory that there was a "conspiracy" in the company to eliminate females from management, and/or prevent them from achieving promotions into upper level management and executive positions, Sullivan responded that she absolutely did not agree. Sullivan Letter, Pl.'s Ex. 35. She stated in her report that Imhoff was defensive about the issues they had discussed, and in particular, her request to transfer, the investigation from Brumley, and the corporation's "conspiracy against women." Id. Sullivan noted that it was difficult to discuss these issues with the Plaintiff because "she had her mind set." Id. Sullivan never followed up with an investigation into the allegations. Pl.'s Stmt. at 18. She explained in her deposition that she did not investigate the complaints because she considered them mere "opinion," and not bona fide complaints. Id.; Sullivan Dep. page 189.

In August, 1998, in December, 1998, and again in March, 1999, the Plaintiff asked to transfer out of the region for various reasons. Pl.'s Stmt at 19. Once, she asked for a transfer that would put her closer to her elderly parents, but was informed that if she was transferred for personal reasons, she had to pay her own expenses. Id.; Pl.'s Ex. 19, page 4. She also asked for a transfer in her conversation with Sullivan in March because she did not think there was any further opportunity for advancement where she was. Id. The Defendants transferred at least one male employee during this time for personal reasons, and he was not required to pay his own moving expenses. Id.

During two store tours with District Manager Rommel, the Plaintiff left the store tour early, which the Defendants claim to be insubordination and grounds for dismissal. Def.'s Br. in Supp. at 8. Plaintiff, however, states that on one of the tours, she asked to leave early so she could eat dinner, and was granted permission to leave. Pl.'s Stmt at 20. The second incident was on June 9, the date of Rommel's last store visit, during which he criticized her constantly, often about things that he had previously complimented her on. Id. Feeling that she was on the verge of breaking down, the Plaintiff left the tour and went to her office, where she cried for a while before deciding to leave the store. Id. Imhoff felt that Rommel was demanding the impossible-asking her to accomplish tasks with inadequate staff. Id. The Plaintiff alleges that the day after she was terminated, the Defendants transferred sixteen additional employees into her store. Pl.'s EEOC Charge.

Haluska Dep. at pages 102 and 91. Karen Townsend, Human Relations manager, testified that in thirty years with the store, she had never seen such an investigation. Townsend Dep. at pages 6 and 43. The new District Manager, Rommel, testified that he had never seen an investigation like the one conducted against the Plaintiff by Mr. Brumley.

**5.** At the time of this investigation, Sullivan had married and her name changed to Gromoll, but for purposes of this Order, the Court will continue referring to her as Sullivan.

In his deposition, Rommel testified that he would not have expected the Plaintiff to continue the store tour if she was emotionally upset, but that he would have expected her to tell him why she was leaving. Id. at 21; Rommel Dep. at page 206. The Plaintiff says, however, that she had left store tours in the past for various reasons, and there had never been a problem with doing so. Pl.'s Stmt at 21. In addition, she thought that if she said anything, she might break down and make a scene in the store. Id.

On June 14, Rommel returned to Plaintiff's store. Id. He told Plaintiff that she had to take a telephone call from St. John. Id. Rommel stood outside the door to Plaintiff's office while she took the call, during which St. John informed her that she must transfer to Alma, Michigan by June 19, 2001, in just five days. Id. Plaintiff told St. John that she did not want to transfer, to which he responded that she was resigning. Id. Plaintiff answered that she was not resigning, at which St. John stated, "That's the problem with you ... you don't listen." St. John then instructed Plaintiff to clean out her desk and leave the premises immediately, and instructed Rommel to supervise her as she removed her personal items from her desk. Id. Plaintiff believed that this forced removal from her office effectively terminated her from a job that had been "her life" for twenty four years. Id.; Haluska Dep. at page 130 (stating, "her life was that store."). The Defendants assert that the Plaintiff was not terminated by the above actions of St. John and Rommel, but that she resigned when she failed to report to the store in Alma, Michigan. Def.s' Br. in Supp. at 13; St. John Dep. at page 113.

During the relevant time period, the Defendants had an opening for a manager in the area to which Plaintiff had requested a transfer, but ironically, the manager from the store in Alma, Michigan, was given that position and Plaintiff was sent to Alma. St. John Dep. at page 114-5. According to St. John, the Regional Vice President, Plaintiff was transferred to the Alma store as a disciplinary measure. St. John Dep. at page 114-5. The Defendants, however, contend in their Brief in Support, and in their Reply, that the transfer was not disciplinary, but was rather to give the Plaintiff a "fresh start" after two acts of insubordination, i.e., leaving the store tours. Def.s' Br. in Supp. at 13; Def.s' Reply at 2, 8.

On July 29, 1999, the Plaintiff filed a charge with the EEOC alleging that KMart had discriminated against her, claiming both sex discrimination and retaliation. She received a Notice of Right to Sue from the EEOC on March 7, 2000, and instituted this suit on April 26, 2000, well within the ninety day time limit.

### III. STANDARD OF REVIEW

The standard a court employs in reviewing a motion for summary judgment is now well-established. Summary judgment is proper only if the record shows that there is no issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir.1999)(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be

granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(quoting Fed.R.Civ.P. 56). Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.'" *Id.* "Factual disputes are 'material' only when they 'might affect the outcome of '" *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 610 (7th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The nonmoving party cannot rest on its pleadings, *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920–21 (7th Cir.1994); *Hughes v. Joliet Correctional Ctr.*, 931 F.2d 425, 428 (7th Cir.1991), nor may that party rely upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir.1992).

Summary judgment is not a disfavored procedural shortcut, but rather is intended to avoid a useless trial, and is appropriate where it is quite clear what the truth is. *Babrocky v. Jewel Food Co. & Retail Meatcutters*, 773 F.2d 857, 861 (7th Cir. 1985). On a motion for summary judgment, the Court must not weigh conflicting evidence, but rather determine whether the non-moving party has presented sufficient evidence for a reasonable factfinder to decide in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Only if no reasonable jury could find for Imhoff should the Defendants' Motion for Summary Judgment be granted. *Hostetler v. Quality Dining*, 218 F.3d 798, 806 (7th Cir.2000) (citations omitted).

## IV. ANALYSIS

The Plaintiff claims that the Defendants discriminated against her in violation of Title VII in a number of ways. First, she alleges that the Defendants discriminated based on her gender when they failed to promote her to district manager, when they refused to transfer her laterally upon her request, and when they terminated her for refusing to accept an undesirable transfer on very short notice. She states that similarly situated male employees were treated more favorably. Imhoff's second claim is that she was subjected to a hostile work environment by her District Manager, Tim Rommel, because of her sex. Her third basis for relief is that the Defendants retaliated against her because she complained about sexual harassment and gender discrimination. In addition, the Plaintiff alleges that the Defendants' discrimination, harassment, and retaliation were so egregious as to amount to an intentional infliction of emotional distress in violation of Indiana state law. Because she believes that KMart's conduct was intentional, wilful, wanton, and grossly negligent, the Plaintiff has also asked for an award of punitive damages.

KMart denies that there is any truth to the Plaintiff's allegations, but asserts, nevertheless, that there are no material issues of fact and that it is entitled to judgment as a matter of law. KMart raises an additional defense, however, that must be addressed first, because it claims that some of the allegations in Plaintiff's Complaint exceed the scope of her EEOC charge, and should be dismissed for that reason without considering the merits. The Court will therefore consider the scope of the Plaintiff's EEOC charge before addressing the merits of any remaining issues properly before this Court.

## A. The EEOC Charge

■ The standard for bringing an EEOC charge is very generous to plaintiffs because courts recognize that most

EEOC complaints are completed by lay-persons rather than lawyers. *See, e.g., Cable v. Ivy Tech State College,* 200 F.3d 467 (7th Cir.1999)(stating that the Court construes the pleadings of *pro se* litigants liberally, and that "the EEOC charge-filing requirement is not intended to erect 'elaborate pleading requirements'; or 'let the form of the purported charge prevail over its substance.'" (citations omitted)); *see also,. Taylor v. Western and Southern Life Insurance Co.,* 966 F.2d 1188, 1195 (7th Cir.1992)(stating that Title VII is to be construed and applied broadly, and that a single charge may launch a full scale inquiry into racial discrimination).

In determining if a cause of action was included in an EEOC charge, the Seventh Circuit looks to see whether the counts in the complaint are "like or reasonably related to" the allegations in the EEOC charge. *Sauzek v. Exxon Coal USA, Inc.,* 202 F.3d 913 (7th Cir.2000). A claim in a judicial complaint is reasonably related to an EEOC charge if "the claim in the complaint can reasonably be expected to grow out of an investigation of the allegations in the charge." *Id. citing Cheek v. Western and Southern Life Insurance Co.,* 31 F.3d 497, 500 (7th Cir.1994); *see also, Taylor v. Western and Southern Life Insurance Co.,* 966 F.2d 1188, 1195 (7th Cir.1992)(stating that to compel the charging party to specifically articulate in a charge filed with the Commission the full panoply of discrimination which he may have suffered may cause the very persons Title VII was designed to protect to lose that protection because they are ignorant of or unable to thoroughly describe the discriminatory practices to which they are subjected (citations omitted) ). The Court looks at the complaint as a whole to determine whether the Plaintiff has given notice to the EEOC and the defendant that she wants a certain claim to be investigated. *Rush v. Mc-Donald's Corp.,* 966 F.2d 1104, 1111 (7th Cir.1992).

In this case, the Plaintiff filed her EEOC complaint *pro se,* marking the boxes for both sex and retaliation in the section that says "Cause of discrimination based on." She included additional factual information in her statement of particulars, noting that she was not promoted to the position of district manager, although she was qualified; that KMart promotes very few women to the position of district manager; that she was harassed and subjected to a hostile work environment by the Regional office; and finally terminated for refusing a transfer, even though similarly situated male employees were not terminated for refusing a transfer.

The Defendants point out that the Plaintiff did not specifically mention in her EEOC charge the earlier transfers that she requested and was denied, or the fact that she was told she would have to pay her own moving expenses on a voluntary transfer. The Defendants claim that these earlier denials of transfers were not "like or reasonably related to" the final transfer that the Plaintiff refused, leading to her termination, and should therefore be barred as beyond the scope of the charge. However, the Plaintiff argues that the Defendants' refusal to send her to a store that would place her closer to her elderly parents, or to transfer her out of the region as she requested, were related to the final transfer that she refused because all were part of the same course of conduct engaged in by the Defendants to get rid of her for complaining about gender discrimination.

Title VII plaintiffs should not be penalized because they included some facts in an EEOC charge supporting their complaint, but omitted others. This Plaintiff included enough information in her EEOC charge to notify the EEOC and the Defen-

dants that she believes she was discriminated against because of her gender. An inquiry by the EEOC into the allegations in the charge could easily have led to additional charges on the previous transfers as related conduct. This meets the minimal requirements for a *pro se* plaintiff filing a charge with the EEOC. The Plaintiff may use the earlier transfers as additional evidence of discrimination.

### B. Gender Discrimination

■ Title VII states that it shall be "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin". 42 U.S.C. § 2000e–2(a)(1). The Plaintiff alleges that the Defendants violated Title VII when they failed to promote her to the position of District Manager because she is a woman. In addition, the Plaintiff claims that she was treated differently from similarly situated male employees when she requested transfers, and when she was finally terminated for refusing an undesirable transfer.

Because Imhoff does not have any direct evidence of discrimination, she relies on the indirect burden-shifting method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this approach, for a failure to promote claim, Imhoff must first establish a *prima facie* case, by showing that: (1) she is a member of a protected class; (2) she applied for and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, she

was rejected; and (4) the position was given to someone not in the protected class who had similar or lesser qualifications. *Malacara v. City of Madison*, 224 F.3d 727, 728 (7th Cir.2000), *rehearing en banc denied;* and *Pafford v. Herman*, 148 F.3d 658, 669 (7th Cir.1998) (citations omitted).

Once a *prima facie* case is established, the burden shifts to the Defendants to produce a legitimate, non-discriminatory reason for their decision. *Id.* The burden of persuasion remains at all times with the Plaintiff. *Id. citing St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the Defendants articulate a non-discriminatory reason, they have met their burden, and the Plaintiff must then establish that the Defendants' proffered reasons were not the real reason, but rather a pretext for discrimination. *Id.*

Imhoff is a woman who expressed an interest in the position of district manager. She was placed on the Defendants' Succession Planning List, trained for the position of district manager by her current district manager, and assessed by an independent human resources evaluation firm as being ready for the District Manager position at KMart. The Court finds that the Plaintiff was qualified for the position, yet despite her qualifications, she was rejected, and persons not in the protected class, males, were given the promotions.

The parties dispute whether the two men who received the promotions were on the Succession Planning List. The Defendants claim they were, but have provided no documentation, such as a copy of the List for the years in question, to refute Plaintiff's evidence that they were not on the List. This is the kind of he said/she said dispute that must be resolved by a jury. For purposes of this motion, viewing the facts in the light most favorable to the Plaintiff, the Court finds that Imhoff was

at least as qualified as the successful candidates, and possibly more so. Therefore, she has met the minimal requirements for a *prima facie* case of discriminatory failure to promote.

The Defendants have given as their legitimate, non-discriminatory reasons for not promoting Imhoff their belief that she was not developmentally ready for the position. Defendants claim that Imhoff was weak in her interpersonal and leadership skills, based on (1) employee complaints; (2) high employee turnover; and (3) poor store visits.[6] Def.s' Br. in Supp. at 9. The Defendants also claim that they promoted the two men, Rommel and Brigee, to the district manager positions because they possessed the best qualifications for District Manager of any Store Manager in the Great Lakes Region. Def.s' Br. in Supp. at 9. The Defendants' burden is one of production, not of persuasion, so the burden shifts back to the Plaintiff to show that these reasons are not the real reason, but rather a pretext for discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The Plaintiff may establish pretext in one of two ways: with direct evidence that the employers decision was more likely than not motivated by a discriminatory reason; or indirectly by evidence that the employers' stated reason was not credible. *Jackson v. Brach Corp.,* 176 F.3d 971 (7th Cir.1999) (citations omitted). To use the indirect method, Imhoff must convince the factfinder by a preponderance of the evidence that the Defendants' stated reasons are "a lie, specifically a phony reason for some action." *Id.* (citations omitted). In other words, pretext may be established "by proving one of the following: '(1) [d]e-

fendant's explanation had no basis in fact; or (2) the explanation was not the real reason; or (3) at least, the reason stated was insufficient to warrant' the adverse job action." *Malacara,* 224 F.3d at 733, Williams in dissent, quoting *Hughes v. Brown,* 20 F.3d 745, 747 (7th Cir.1994).

The question before the court on a summary judgment motion is "whether [Imhoff] has created a genuine issue concerning the sincerity of the proffered reasons" given for the adverse employment action. *Id.* The Plaintiff cannot prevail if the Defendant "honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish, trivial, or even baseless." *Bell v. Environmental Protection Agency,* 232 F.3d 546, 550 (7th Cir.2000) (citations omitted).

The Seventh Circuit has repeatedly expressed concern about sitting as a "superpersonnel department," reexamining an entity's business decisions. *See, Gordon,* 246 F.3d at 889 (stating, "Our cases have warned, repeatedly, that we do not sit as a superpersonnel department that will second guess an employer's business decisions"). However, Judge Ripple, writing for the Court in *Gordon,* went on to say that the Court need not abandon good reason and common sense in assessing an employer's actions. *Id.* On the contrary, this Circuit has sometimes used a reasonableness test in order to determine whether a belief was honestly held. *See, Flores v. Preferred Technical Group,* 182 F.3d 512, 516 (7th Cir.1999)(stating that a determination of whether a belief is honest is often conflated with analysis of reasonableness).

The Court must determine, therefore, whether Imhoff has created a genuine is-

---

**6.** Defendants include another reason, verbal communications between the district manager and higher management regarding verbal complaints from assistant managers, but this factor is not distinguishable from the first factor, employee complaints.

sue as to the sincerity of the Defendants' belief that she was not developmentally ready for the position of district manager for the reasons given: weak interpersonal and leadership skills based on employee complaints; high employee turnover; and poor store visits. The Plaintiff has submitted the following evidence to establish that the Defendants' alleged reasons were in reality a pretext for discrimination:

1) Performance reviews from twenty-four years with the Company that consistently rate her as meets or exceeds expectations in the areas of interpersonal communication and leadership skills, as well as her general management skills.

2) Deposition testimony from District Manager Dave Haluska, stating that Imhoff is an excellent communicator and expresses herself well.

3) Additional testimony by Haluska that he expected Imhoff to be his replacement.

4) A positive review by an outside human resources evaluation firm concluding that "Charlotte appears ready for the District Manager Position at KMart."

5) A memorandum by Sullivan, Regional Director of Human Resources, stating that Imhoff interacts well with her management and hourly associates, communicates in a professional way, and that she utilizes logic and common sense to get her message across.

A reasonable factfinder could conclude from this evidence that the Defendants did not have an honest belief that Imhoff was not developmentally ready for the position because of weak communication and interpersonal skills.

On the issue of the employee complaints and high employee turnover, particularly in management, Imhoff has presented the deposition testimony of Dave Haluska indi-cating that he was not really concerned by this turnover because he considered it to be part of her efforts to "get the right management team in there." Haluska Dep. at page 35. Haluska stated, "You know, I see managers come and go. In my opinion, I felt she was always trying to upgrade her management team. Now, the managers that left, did they fell that way? Obviously not." Based on this testimony, a reasonable juror could believe that KMart did not honestly believe that the high turnover in management in Plaintiff's store was a result of her weak interpersonal and leadership skills.

The Plaintiff has also produced statistical evidence to support her claim of gender discrimination at the higher levels of KMart's corporate ladder, at least in the Great Lakes Region. She submitted evidence that at the time she was denied the promotion, the Defendants had twenty-five district managers in the region, only one of which was a woman, and she was subsequently demoted. In addition, she has submitted the deposition testimony of Regional Vice President St. John's, in which he states that he cannot recall ever promoting a woman to district manager in his career. The Defendants did not challenge the accuracy of this statistical evidence in their Response to the Plaintiff's Statement of Material Fact.

While the Seventh Circuit has rejected the use of statistics as the primary means of establishing discrimination in disparate treatment situations, they may be utilized in conjunction with other evidence of disparate treatment, and may be probative of whether the alleged disparity is the result of discrimination. *Bell*, 232 F.3d at 552. The use of statistics in an individual treatment case to show pretext "depends on all the surrounding facts and circumstances." *Id.* at 553. In this case, the Plaintiff's statistical evidence combined

with the surrounding facts and circumstances, are sufficient to allow a reasonable juror to conclude that the Defendants proffered reasons for their decision not to promote Imhoff to the position of district manager were a pretext to cover up the real reason, discrimination because of her gender. Therefore, the Defendants' Motion for Summary Judgment on the issue of gender discrimination must be **DENIED.**

## C. Sexual Harassment

■ Imhoff has also claimed that the Defendants discriminated against her by subjecting her to sexual harassment and a hostile work environment because of her gender, also a violation of Title VII. For sexual harassment to be actionable, it must be "so objectively offensive as to alter the 'conditions' of the victim's employment and create an abusive working environment." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806 (7th Cir.2000), *quoting Meritor Savings Bank*, 477 U.S. at 67, 106 S.Ct. 2399. In *Hostetler*, Judge Rovner, writing for the Court, stated, "Whether the harassment rises to this level turns on a constellation of factors that include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (citations omitted). In addition, the court must assess the impact of the harassment both objectively and subjectively. *Id.* The plaintiff cannot establish that she was subjected to a hostile work environment for purposes of Title VII unless a reasonable person would find it offensive, and that she actually perceived it as such. *Id.*, citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

■ In this case, Imhoff has described behavior by the Defendants' corporate executive, John Curry, that probably meets the requirements of both objective and subjective offensiveness. However, she did not include that conduct in her EEOC charge, or her complaint. She argues in both of those filings that it was Tim Rommel, the new district manager, that was harassing her because of her gender and who subjected her to a hostile work environment. None of the conduct that she lists in the charge or her complaint was sexual in nature, nor does she give any indication why she believes that Rommel's harassment was because of her gender. The Plaintiff's lack of a factual basis to support her allegations of sexual harassment and a hostile work environment require dismissal of this claim.[7]

## D. Retaliation

■ Title VII forbids an employer to "discriminate against any individual ... because he has made a charge ... or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e–3(a). Imhoff claims that the Defendants retaliated against her for complaining first about John Curry's offensive behavior, and later about what she perceived to be gender inequities in KMART's upper echelons. To establish a *prima facie* case of retaliation, Imhoff must show: 1) that she engaged in statutorily protected expression

---

7. The behavior of John Curry cannot be brought in at this stage of the litigation to support the Plaintiff's claim of sexual harassment because it was not mentioned, nor is it like or reasonably related to the conduct she describes in her EEOC charge and her complaint. Nothing in this determination, however, prevents the Plaintiff from bringing in Curry's offensive behavior as the basis for her retaliation claim, as it was this behavior, and her objections to it, that, according to the Plaintiff, led to her downfall.

by complaining about discrimination covered by Title VII; 2) that she suffered an adverse job action; and 3) that there is a causal link between the protected expression and the adverse job action. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003 (7th Cir. July 26, 2000) (citations omitted).

If the Plaintiff is successful in establishing a *prima facie* case, the Defendants, to avoid liability, are obligated to produce a legitimate, non-retaliatory reason for their actions. *Paluck*, 221 F.3d at 1009 (citations omitted). Then, to succeed in her claim, the Plaintiff must respond by showing that the Defendants' proffered reason is not the real reason, but is merely a pretext for retaliation. *Id.*

Imhoff filed at least two complaints, the first with corporate headquarters in August, 1998; the second with the regional office in October, 1998, relating to sexual harassment by a corporate executive while at her store. In addition, she complained on more than one occasion about perceived gender inequities at the upper management level, and about what she considered to be a "conspiracy" to keep women out of upper management. These complaints qualify as protected activity under Title VII.

The Defendants argue that the Plaintiff's retaliation claim fails on prongs two and three because she did not suffer an adverse job action. However, immediately after her second complaint in October, Imhoff received her first reprimand at KMart. At the end of October, the position of district manager came open, but Imhoff was not considered for the position, even though she had been trained for the position by her former district manager, Dave Haluska, who believed that she would be the one to take his place. Then, after Imhoff complained to management about not getting the promotion, and expressed concern that there appeared to be gender inequities in KMART's upper management, Imhoff was subjected to an unprecedented investigation, frequent store visits, criticism in front of her subordinates, denied transfers that she requested, and finally ordered to transfer as a punishment for supposed insubordination.[8] When she stated she did not want to transfer, she was terminated and escorted from the store immediately. Both the Defendants' failure to promote the Plaintiff, and her forced resignation qualify, at least in this Circuit, as adverse job actions.

On prong three, a plaintiff may establish a causal connection by introducing evidence that the adverse employment action took place on the heels of protected activity. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir.1997). A close temporal connection between the two events may be enough to satisfy this requirement. *Id.* Here, the Plaintiff has submitted evidence that she was successfully working her way up through the ranks of the Defendants' corporate structure until she complained about sexual harassment by a corporate executive. She received her first reprimand in twenty-four years as a KMART manager the same month that she filed her second complaint of harassment. After that, she was denied transfers, denied a promotion, subjected to an unprecedented in-store inves-

---

8. The Court notes that KMart contests Plaintiff's characterization of the events of June 14, 1999 as a termination, and asserts that she resigned when she failed to show up at her new assignment. However, the Plaintiff's account of the events that took place on June 14, 1999, if believed by the fact finder, would support a finding that KMART intentionally set her up in order to terminate her; and that a reasonable person, upon being escorted from the store with all her personal belongings, would have considered herself fired and would not have shown up for the new assignment in Alma, Michigan.

tigation, criticized and harassed until finally, she was forced out of the company altogether.

A jury could believe, based on this evidence, that the Defendants immediately began building a record that would enable them to terminate the Plaintiff after and because she filed the complaints. The facts are similar to the situation in *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, (7th Cir.2000), where Chief Judge Posner, writing for the Court, stated that a reasonable jury could believe that after and because the Plaintiff filed a claim, "the firm was 'laying' for her, biding its time to create a space between the date of the claim and the date of the discharge, and in the interval gathering pretextual evidence of misconduct to provide a figleaf for its retaliatory action." As in *Pryor*, this Court is not holding that this is the correct interpretation of events, only that the Plaintiff has presented sufficient evidence that a jury could believe this is what happened. Therefore, the Defendants' Motion for Summary Judgment is **DENIED** on the issue of retaliation.

### E. Intentional Infliction of Emotional Distress

█ Finally, Defendants seek summary judgment on Imhoff's state law claim for emotional distress. Intentional infliction of emotional distress is committed by "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another . . . ." *Ledbetter v. Ross*, 725 N.E.2d 120 (Ind.Ct.App. 2000); *citing · Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind.1991). It is the intent to harm one emotionally that constitutes the basis for the tort of an intentional infliction of emotional distress. *Id.* However, the requirements to prove this tort are "rigorous." KEETON ET AL., § 12 at 61.

█ It is not enough that the Defendants acted with an intent that was tortious, or even criminal, or that they intended to inflict emotional distress, or even that their conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. "Liability has only been found where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bradley v. Hall*, 720 N.E.2d 747, 753 (Ind.Ct.App. 1999). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'" *Id., citing* R.2d Torts § 46.

█ In *Bradley*, the Indiana Court of Appeals found there was a triable issue of fact on the plaintiff's claim where she alleged that her supervisor harassed her, shouted at her, and criticized her work in front of other employees, inquired about her menopause and asked whether her husband was sexually impotent from diabetes, and where her supervisor misrepresented the company's intentions about the security of her position. *Id.* The Court concluded that this conduct could be considered severe and outrageous, and permitted an inference that the supervisor intended to harm the plaintiff emotionally. *Id.; but see, King v. Wiseway Super Center, Inc.*, 954 F.Supp. 1289 (N.D.Ind.1997) (dismissing a claim for intentional infliction of emotional distress, where the Plaintiff's supervisor constantly sabotaged her efforts to perform her job by scheduling her improperly, not allowing her to perform her job duties, not treating her as a manager, not giving her the information she needed, never communicating with her,

never training her, forcing her to work without breaks, and making derogatory comments to others about her and her abilities); *see also, McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159 (7th Cir. 1997) (holding that a single incident of yelling at plaintiff and refusing to assign him to quality control is not the kind of "extreme and outrageous conduct" the Indiana Supreme Court had in mind when it adopted the tort).

In the present case, Imhoff has not alleged facts sufficient to support a claim that the Defendants' conduct was severe and outrageous, or that their intent was to harm her emotionally. While the Defendants' change in attitude towards her was undoubtedly distressing to the Plaintiff-as for example, when she had to leave the store tour because she was on the verge of tears-it does not exceed all bounds usually tolerated by a decent society, such that a person hearing of it would exclaim, "Outrageous." Accordingly, summary judgment is **GRANTED** for the Defendants on Plaintiff's claim for intentional infliction of emotional distress.

### V. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is hereby **GRANTED** with respect to the Plaintiff's claims for sexual harassment and intentional infliction of emotional distress, but **DENIED** as to her claims for sex discrimination and retaliation. With no personal or professional disrespect intended, it is clearly apparent that counsel for both Plaintiff and Defendants in this case are prime candidates for deep reality therapy. The first stage of that effort, notwithstanding the patience and the time consumed by the United States Magistrate Judge, was unsuccessful and apparently unappreciated by counsel for the Defendants.

It was reported to this Court informally that one attorney for the Defendants stopped just short of being disrespectful in attitude and conduct before the United States Magistrate Judge. It is fervently hoped that *that* attitude and conduct will not be repeated when trial counsel for all parties again meet on the subject of settlement with the same United States Magistrate Judge in South Bend, Indiana, which is ORDERED to occur before July 1, 2001. This Court and the Magistrate Judge cannot force a settlement and are fully aware of the parameters of their authority, but this Court and the Magistrate Judge can and do require the full good faith participation of all counsel for all of the parties in this case.

**IT IS SO ORDERED.**